

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TM:RJN  *271 Cadman Plaza East*
F.#2009R01167  *Brooklyn, New York 11201*

February 1, 2012

**BY HAND AND ECF**

The Honorable Eric N. Vitaliano
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:  United States v. Joseph Cutaia
           Criminal Docket No. 10-0010 (S-6) (ENV)

Dear Judge Vitaliano:

      The government respectfully submits this letter in advance of the defendant's sentencing, scheduled for February 3, 2012 at 11:00 am and in response to the defendant's January 28, 2012 sentencing submission ("Def. Let.").

I.    Background

      On April 1, 2011, Joseph Cutaia ("J. Cutaia") pled guilty pursuant to a plea agreement ("Plea Agreement") to Counts Twenty-Three, Twenty-Four and Twenty-Six of a superseding indictment. Counts Twenty-Three and Twenty-Four charge the defendant with Hobbs Act Robbery Conspiracy in violation of 18 U.S.C. § 1951(a). Count Twenty-Six charges the defendant with the unlawful use of a firearm in connection with the robbery charged in Count Twenty-Four, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).

      The charges stemmed from an investigation into the activities of members and associates of La Cosa Nostra, and in particular, into criminal activities including loansharking, extortion and armed robberies, engaged in by members and associates of the Luchese organized crime family (the "Luchese family") of La Cosa Nostra ("LCN").

      As set forth in the Probation Department's Presentence Report ("PSR"), the investigation revealed that J. Cutaia was an associate in the Luchese family. He reported to his father and co-defendant, Salvatore Cutaia, Sr. ("S. Cutaia"), a Luchese family soldier and his grandfather and co-defendant, Domenico

Cutaia ("D. Cutaia"), a Luchese family captain. However, beginning in approximately 2008, J. Cutaia also reported to Luchese family captain and co-defendant Joseph Lubrano ("Lubrano"). Lubrano insisted that J. Cutaia and other Luchese family associates make regular payments to Lubrano from their criminal proceeds. PSR ¶ 19. In large part, these payments came from robberies committed by J. Cutaia and his coconspirators. In exchange, Lubrano provided protection to J. Cutaia when he and his coconspirators robbed individuals associated with other LCN families.

II. The Robberies

    A. The Robbery of Jane Doe

In approximately October 2009, one of J. Cutaia's coconspirators, Frank Portera, who was working as a contractor in Jane Doe's home in Poughkeepsie, New York, advised J. Cutaia that Jane Doe stored a substantial sum of money in a safe inside her home.[1] Portera advised that Jane Doe had received the money during her divorce from an individual who Portera believed to have been involved in criminal activity in Florida. After receiving the robbery tip, J. Cutaia enlisted the assistance of two other coconspirators ("CW1" and "CW2"), and they planned the home invasion robbery with Portera. On the day of the robbery, Joseph Cutaia, CW1 and CW2 drove from Staten Island to Poughkeepsie to meet Portera. Armed with guns, J. Cutaia, CW1 and CW2 entered the residence while Portera waited in the car with a walkie-talkie. Inside, J. Cutaia, CW1 and CW2 used zipties to restrain Jane Doe. They took old jewelry, coins, and approximately $10,000 from the safe. They cut Jane Doe's phone lines to prevent her from calling the police, and left her tied to a chair. Over 24 hours later, after J. Cutaia, CW1 and CW2 returned to Staten Island, Portera contacted 9-1-1, advising the police of an incident at Jane Doe's residence, without admitting to the police that he had been involved in the robbery. When police responded, they found Jane Doe restrained in her chair. PSR ¶¶ 78-81.

    B. The Robbery of John Doe #5

In approximately October 2009, S. Cutaia directed J. Cutaia, CW1 and CW2 to rob John Doe #5. S. Cutaia believed that John Doe #5 stored a substantial sum of the proceeds from

---

[1] Portera pled guilty to his involvement in the robbery in New York State Court, Dutchess County.

his electronic store business in his home in Brooklyn, New York. Several years earlier, in 2004, S. Cutaia had directed J. Cutaia to rob the same individual. Although J. Cutaia and his coconspirators stole approximately $400,000 in 2004, S. Cutaia was not satisfied because he believed the victim had more cash hidden in the home. PSR ¶¶ 65-69. On November 11, 2009, J. Cutaia and his coconspirators, including CW1, CW2 and co-defendant Anthony Cutaia ("A. Cutaia") attempted the robbery. They used two vans rented by another coconspirator ("CW3") and followed the victim home from his business. When the victim turned onto his block, A. Cutaia parked one of the vans in front of the victim's car and J. Cutaia parked the other van behind the victim's car to block him from proceeding. CW1 and CW2 broke the windows of the victim's car and tried to force him into the back seat. They threatened him with guns and intended to overtake his car, drive it to his home where they planned to restrain him with zipties, and demand that he inform them of the location where he stored the proceeds of his business. J. Cutaia was concerned that John Doe #5 might recognize him as he entered the home. Therefore, J. Cutaia instructed CW1 and CW2 to restrain John Doe #5 in his garage to ensure that John Doe #5 was not able to see J. Cutaia as he entered the house to commit the robbery. However, the victim managed to escape from the car. As he did so, CW2 fired gun shots, but did not hit anyone. PSR ¶¶ 68-70. J. Cutaia and the others then fled the scene. Later that night, J. Cutaia instructed CW3 to report to the police that one of the vans had been stolen. Subsequently, J. Cutaia and his coconspirators reported the results of the attempted robbery to S. Cutaia.

### C. Additional Robberies

As set forth in the PSR, in addition to the robberies charged in Counts Twenty-Three and Twenty-Four, between approximately 2002 and 2009, J. Cutaia was involved in multiple armed robberies of individuals J. Cutaia believed to be involved in illegal activities such as narcotics trafficking and bookmaking. During these robberies, J. Cutaia and his co-conspirators threatened the victims with guns and knives, restrained them with zipties, and in certain instances, physically assaulted and even shot the victims. PSR ¶¶ 90-93, 95, 98, 100-119. The details of five of those robberies set forth below are representative of the very violent methods J. Cutaia employed.

In 2008 or 2009, J. Cutaia and his coconspirators robbed an individual J. Cutaia believed to be a marijuana dealer of $30,000. During the robbery, J. Cutaia choked the victim

while one of his coconspirators threatened him with a gun. PSR ¶ 98.

In the summer of 2009, J. Cutaia, CW1 and CW2 robbed an individual they believed to be a bookmaker for members of organized crime. The victim was restrained in his bed, and when the victim's wife arrived during the robbery, J. Cutaia and his coconspirators threatened to kill her husband if she did not reveal where their money was hidden. Approximately $30,000 was stolen, which J. Cutaia and his coconspirators, including S. Cutaia and Lubrano, divided among themselves. PSR ¶¶ 75-76.

In August 2009, J. Cutaia and his coconspirators assaulted an individual believed to be a cocaine dealer outside his car leasing business, forced him into their car, wrapped him in a blanket and carried him into CW1's home. Inside, J. Cutaia threatened to cut off the victim's toes to force him to reveal where he stored the proceeds of his drug business. When the victim admitted he stored the proceeds at his mother's house, J. Cutaia and his coconspirators drove him to that location and stole approximately $30,000, cocaine, and several expensive watches. PSR ¶ 105.

In November 2009, J. Cutaia, CW1 and CW2 robbed another individual in Brooklyn who they also believed to be a drug dealer. When the victim struggled, he was shot in the knee by one of J. Cutaia's coconspirators, and J. Cutaia threatened to kill the victim if he reported the incident to the police. PSR ¶ 86.

In another robbery in October or November 2009, J. Cutaia and his coconspirators pistol-whipped an individual in a residence in Queens, New York, based on a tip that drugs and money were stored in the home. PSR ¶ 109.

Moreover, in addition to the numerous robberies he committed between 2008 and 2009, J. Cutaia was also involved in the robberies of at least two commercial establishments several years earlier. In approximately 2000, he and CW2 robbed the manager of a convenience store in Staten Island, New York, threatening the safety of the victim's children in order to prevent the victim from reporting the crime to the police. In approximately 2003, J. Cutaia robbed a Manhattan diner, along with CW2 and co-defendant Anthony Manzella. During the robbery, they assaulted an employee of the diner and stole $21,000.

III. <u>Debt Collection</u>

    J. Cutaia also used threats of violence to collect money owed to him or others members of the Luchese family. For example, after a Luchese family soldier ("CW4") borrowed money from D. Cutaia at an interest rate of two percent per week, J. Cutaia, along with S. Cutaia, used implicit and explicit threats to assist D. Cutaia in collecting the payments owed by CW4. PSR ¶¶ 22-28.

    On occasions when CW4 was late with a payment or failed to make the full weekly payment owed, J. Cutaia became enraged and communicated implicit and explicit threats regarding CW4's safety. During several meetings between January and February 2009, which CW4 consensually recorded, CW4 made interest payments to J. Cutaia ranging from $500 to $700 each. However, these payments were less than the amount J. Cutaia expected and between January 19, 2009 and February 4, 2009, J. Cutaia left several threatening voice mails for CW4. For example, during one message, J. Cutaia stated:

> . . . .[CW4] you gotta call my phone back [CW4]. . . .you hear me. . . .you gotta call me back [CW4]. . . .I don't know what kind of f-ing game you want to play here . . . .[CW4], but I'm not the right one to play games with. . . . call my phone back [CW4].

    Furthermore, J. Cutaia attempted to extort money from a Bonanno family associate ("CW5") whom J. Cutaia held responsible for a botched burglary. In approximately 2008, J. Cutaia agreed to commit the burglary based on a tip from CW5. However, just before entering the home, J. Cutaia was forced to abort the burglary when CW5 learned that the victim was expected to arrive home earlier than expected. J. Cutaia held CW5 responsible, and demanded he pay $10,000. When he failed to pay, J. Cutaia participated in a sitdown with codefendants S. Cutaia and Anthony Mannone, a Bonanno family captain, in an effort to force CW5 to pay the money J. Cutaia claimed he was owed. PSR ¶¶ 57-64.

IV. <u>Presentence Report</u>

    A. <u>The Offense Level Calculation</u>

    According to the PSR, the defendant's total offense level is 34 and his criminal history category is VI, for a range of imprisonment under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 262 to 327 months. PSR ¶¶ 171, 173, 202, 241. The minimum term of imprisonment for

5

Count Twenty-Six is ten years, which must run consecutively to the term of imprisonment imposed for Counts Twenty-Three and Twenty-Four. PSR ¶ 240; 18 U.S.C. § 924(c)(1)(C)(iii). Thus, the total range of imprisonment set forth in the PSR is 382 to 477 months.

The calculation of the defendant's base offense in the PSR differs from the Guidelines calculation set forth in the Plea Agreement primarily because, according to the PSR, the defendant is a career offender pursuant to the Career Offender Guideline set forth at U.S.S.G. § 4B1.1. Pursuant to that section, the base offense level for a career offender is the greater of 37 or the offense level that would otherwise apply under the Guidelines. U.S.S.G. § 4B1.1(a). According to the PSR, the base offense level that would otherwise apply is 30.[2] Thus, the greater offense level of 37 applies pursuant to the Career Offender Guideline. U.S.S.G. § 4B1.1(b)(1). With the three-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b), the defendant's total offense level set forth in the PSR is 34.

As set forth in the PSR and as J. Cutaia acknowledges in his submission (Def. Let. at 5), J. Cutaia was convicted of two prior violent felonies - sexual abuse in violation of New York Penal Law 130.50(1) and attempted burglary in the third degree, in violation of New York Penal Law § 140.20. Pursuant to

---

[2] To reach the offense level of 30, the PSR includes two enhancements that were not included in the Plea Agreement. With respect to Count Twenty-Three, the PSR includes a one-point enhancement for loss amount above $10,000, pursuant to U.S.S.G. § 2B3.1(b)(7)(B). With respect to Count Twenty-Four, the PSR includes a role enhancement of three-points pursuant to U.S.S.G. § 3B1.1(b). Thus, the adjusted offense level set forth in the PSR, prior to the application of the Career Offender Guideline, including the three-point reduction for acceptance of responsibility is 27, whereas the Plea Agreement estimated the adjusted offense level to be 25. Although these enhancements have factual support, they were not included in the Plea Agreement because the parties agreed that their applicability was a close question, and therefore, in accordance with its obligations set forth in the Plea Agreement, the government does not seek to apply them at sentencing. See United States v. Vaval, 404 F.3d 144, 152-54 (2d Cir. 2005). In addition, the government agreed to recommend a reduction of two points for global disposition of the case, pursuant to U.S.S.G. § 5K2.0, which, if applied, brings the adjusted offense level in the PSR to 25 and the adjusted offense level in the Plea Agreement to 23.

6

<u>United States v. Brown</u>, 514 F.3d 256, 268-69 (2d Cir. 2008), a violation of New York Penal Law § 140.20 qualifies as a crime of violence for the purposes of the Career Offender Guideline.

However, because of the parties' good faith mistake in failing to predict that the defendant's conviction for burglary qualified as a crime of violence at the time the defendant entered his guilty plea, the government is constrained by the Plea Agreement and takes no position on whether the Court should apply the higher base offense level provided by the Career Offender Guideline, or the total offense level of 25 set forth in the Plea Agreement.

Although the parties did not anticipate that the burglary offense qualified as a crime of violence, and thus did not anticipate that the Career Offender Guideline would apply, the defendant was specifically advised, in the Plea Agreement and during the guilty plea proceeding, that the calculation of his criminal history and offense level is only an estimate and not binding on the government or the Court. <u>See</u> Plea Ag. ¶¶ 3,5; <u>United States v. Habbas</u>, 527 F.3d 266, 272 n.1 (2d Cir. 2008) ("furnishing of a guidelines estimate will not bar the government from making good-faith changes to its position, even as to information already in its possession, if, for instance, further study shows the applicability of guideline provisions not considered in making the estimate" provided the agreement reserves that prerogative to government).

Regardless of whether the Court applies the total offense level based on the Career Offender Guideline or the total offense level estimated in the Plea Agreement, pursuant to the Plea Agreement, the government agreed to recommend a further reduction of two points for global disposition of the case, pursuant to U.S.S.G. § 5K2.0.

B. <u>The Criminal History Calculation</u>

According to the PSR, pursuant to the Career Offender Guideline, the applicable Criminal History Category is VI. The Plea Agreement, though it does not apply the Career Offender Guideline, also includes a Criminal History Category of VI, based on each of the defendant's prior convictions.

According to the PSR, the defendant's criminal history would be Category V, but for the application of the Career Offender Guideline. However, the government respectfully submits that Criminal History Category VI is appropriate regardless of whether the Career Offender Guideline is applied. The PSR applied no criminal history points for the defendant's conviction

7

in 2001 for resisting arrest. However, pursuant to U.S.S.G. § 4A1.1(c), one point should be added for this conviction, giving the defendant 13 criminal history points, which corresponds to Criminal History Category VI.

V.  Sentencing

The defendant argues that a sentence of fifteen years is sufficient pursuant to the factors set forth in 18 U.S.C. § 3553(a). Def. Let. at 13-14. However, the government respectfully submits that a sentence below the Guidelines range of 212 to 235 months (approximately 17 to 19.5 years) set forth in the Plea Agreement is not supported by the facts and circumstances of this case.

As set forth above, the defendant's criminal conduct and involvement with organized crime spanned at least ten years. He was responsible for using threats of violence to collect money for other members of the Luchese family, but, perhaps more importantly, between 2000 and 2009, he participated in multiple violent robberies, during which the victims were threatened with guns and knives, restrained with ties, and in certain instances, beaten and even shot. Although some of the individuals the defendant robbed were, themselves, involved in some form of criminal activity, others including Jane Doe, the victim of the robbery charged in Count Twenty-Three, are entirely innocent, hardworking individuals. Moreover, the defendant shared the proceeds of his various criminal acts, including proceeds from certain robberies, with other members and associates of organized crime, and in particular, with members and associates of the Luchese family, thereby strengthening a violent criminal enterprise. Thus, a substantial sentence is necessary to punish his repeated acts of violence.

Furthermore, while the defendant claims that he was preparing to start a new chapter in his life (Def. Let. at 13), his lengthy criminal history demonstrates that a substantial sentence is also necessary to deter him from engaging in criminal activity in the future.

VI. Conclusion

Consistent with the terms of the Plea Agreement, the government takes no position on where within the applicable Guidelines range the defendant's sentence should fall. However, for the reasons set forth above, the government respectfully submits that a sentence below the Guidelines range of 212 to 235 months' imprisonment, as estimated in the Plea Agreement, is not

8

warranted under the sentencing factors set forth in 18 U.S.C. § 3553(a).

                                                  Respectfully submitted,

                                                  LORETTA E. LYNCH
                                                  United States Attorney

                                By:      /s/
                                                  Rachel J. Nash
                                                  Assistant U.S. Attorney
                                                  (718) 254-6072

cc:  Seth Ginsberg, Esq., Via ECF
     Angelica Deniz, U.S. Probation, Via ECF